THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
18 June 2009
AD

# UNITED STATES PATENT AND TRADEMARK OFFICE

————

## Trademark Trial and Appeal Board

————

In re Toshiba Medical Systems Corporation

————

Serial No. 79046106

————

David M. Kelly of Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P. for Toshiba Medical Systems Corporation.

Marilyn D. Izzi, Trademark Examining Attorney, Law Office 112 (Angela B. Wilson, Managing Attorney).

————

Before Seeherman, Drost, and Ritchie, Administrative Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

On October 17, 2007, Toshiba Medical Systems Corporation (applicant) applied to register the mark VANTAGE TITAN, in standard character form, on the Principal Register for goods ultimately identified as "medical magnetic resonance imaging diagnostic apparatus, namely, MRI diagnostic apparatus" in Class 10. Serial No. 79046106. The application is a request for an extension of protection under Section 66(a) of the Trademark Act (15

U.S.C. § 1141f(a)) based upon International Registration No. 0943219. The application includes a claim of ownership of Registration Nos. 2448220 (EXCELART and design); 3366176 (VANTAGE ATLAS); and 3366177 (EXCELART VANTAGE ATLAS).

The examining attorney has refused to register applicant's mark under Section 2(d) of the Trademark Act (15 U.S.C. § 1052(d)) because of the registered mark TITAN, in typed or standard character form, for "medical diagnostic apparatus, namely, medical ultrasound device" in Class 10.[1]  When the refusal was made final, a request for reconsideration and this appeal followed.

## Issue

Is applicant's mark VANTAGE TITAN for a medical magnetic resonance imaging diagnostic apparatus, namely, MRI diagnostic apparatus, likely to cause confusion, mistake or deception under Section 2(d) of the Trademark Act (15 U.S.C. § 1052(d)) in view of a prior registration for the mark TITAN for a medical diagnostic apparatus, namely, medical ultrasound device?

## Facts

Both applicant's and registrant's goods are medical diagnostic apparatus.

---

[1] Registration No. 2978496 issued July 26, 2005.

Applicant's goods use magnetic resonance imaging[2] technology while registrant's goods use ultrasound[3] technology.

These machines can be used as part of a common diagnostic approach and they can be used together:

> Radiologist Suzanne LeBlang is moving a mouse and firing away, feeling a bit like her kids do playing videogames.  She's controlling a million-dollar ultrasound machine that is heating up and destroying jelly-bean size sections of a fibroid tumor that has caused the patient in the next room serious discomfort for ten years.  LeBlang, who practices in Boca Raton, Fla., is simultaneously using an MRI machine to guide the zapping so it avoids healthy tissue.
> *Forbes*, October 13, 2008.

> In addition to digital mammography, Teton Radiology Madison will offer MRI, ultrasound, bone densitometry, CT and X-ray services.
> *Idaho Falls Post Register*, October 7, 2008.

> The new treatment magnetic resonance imaging (MRI)-guided transurethral ultrasound uses heat from focused ultrasound to treat cancer in the prostate gland…
> The therapy involves two different and naturally incompatible technologies, ultrasound and MRI, which Bronskill and Chopra spent 10 years making compatible.  "You have to make an ultrasound heating applicator work inside a magnetic resonance imager, without the

---

[2] "Magnetic Resonance Imaging (MRI) … uses powerful magnets to polarise and excite hydrogen nuclei (single proton) in water molecules in human tissue, producing a detectable signal which is spatially encoded resulting in images of the body."  Final Office Action, www.wikipedia.org.  The "Board will consider evidence taken from Wikipedia so long as the non-offering party has an opportunity to rebut that evidence…."  *In re IP Carrier Consulting Group*, 84 USPQ2d 1028, 1032 (TTAB 2007).
[3] Ultrasound "uses high frequency sound waves of between 2.0 and 10.0 megahertz that are reflected by tissue to varying degrees to produce a 2D image, traditionally on a TV monitor."  Final Office Action, www.wikipedia.org.

two technologies interfering with each other," says Bronskill, who is a professor at the University of Toronto. "The prostate cancer site is a natural for this technology because it's surrounded by structures you want to spare."
*Pharma Investments, Ventures & Law Weekly*, October 5, 2008.

Toshiba Installs Vantage Titan System at Health Scan Imaging…
Health Scan Imaging provides its customers access to the industry's most advanced technology, including high-resolution multislice 3D CT, high-field open concept multichannel MRI, ultrasound and digital X-ray.
*Business Wire*, October 8, 2008.[4]

Series #2: Mary
Mary found a lump in her breast. To evaluate it further, she had a full mammogram, followed by ultrasound and MRI.
www.breastcancer.org

Ultrasound and Magnetic Resonance Portfolio
www.medical.philips.com

The same companies, including applicant itself, produce both ultrasound and MRI medical diagnostic imaging machines. *See, e.g.*, *Business Wire*, October 8, 2008 ("Toshiba Installs Vantage Titan MR System at Health Scan Imaging… Toshiba Medical Systems Corp. [applicant], an independent group company of Toshiba Corp.,[5] is a global

---

[4] *In re Cell Therapeutics Inc.*, 67 USPQ2d 1795, 1798 (TTAB 2003) (While "we are not saying that newswire stories are of the same probative value as are stories appearing in magazines and newspapers, we think that the situation has changed such that said newswire stories have decidedly more probative value than they [previously] did").

[5] *See also* Reg. No. 1923358 (TOSHIBA for, inter alia, "magnetic resonance imaging machines for medical use; ultrasound diagnostic machines for medical use").

leading provider of diagnostic medical imaging systems and comprehensive medical solutions, such as CT, Cath & EP Labs, X-ray, Ultrasound, MRI and information systems); *Healthcare Mergers, Acquisitions & Ventures Week*, October 11, 2008 ("GE Healthcare is the world's largest manufacturer of medical devices such as ultrasound and CT/MRI"); www.medical.philips.com (Philips magnetic resonance and ultrasound imaging systems); www.medical.toshiba.com (Toshiba ultrasound and magnetic resonance imaging systems); www.medical.siemens.com (Siemens ultrasound and magnetic resonance imaging systems); Reg. No. 2857363 (DOT MED for, inter alia, "ultrasound diagnostic apparatus; MRI apparatus"); and No. 2436432 (EVERYTHING FOR YOUR IMPLANT PRACTICE BUT THE IMPLANTS for, inter alia, "MRI, ultrasound and X-ray diagnostic apparatus").[6]

## Discussion

We now must determine whether the examining attorney's refusal on the ground that there is a likelihood of confusion in this application should be affirmed. In a case involving a refusal under Section 2(d), we analyze the

---

[6] Use-based, third-party registrations may "serve to suggest that such goods or services are of a type which may emanate from a single source." *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467, 1470 n. 6 (TTAB 1988).

facts as they relate to the relevant factors set out in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003) and *Recot, Inc. v. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1896 (Fed. Cir. 2000).

We begin our analysis by looking at the similarities and dissimilarities of the marks in the application and registration. Here, registrant's mark is TITAN and applicant's mark consists of registrant's mark with the additional word VANTAGE. Therefore, the marks are the same because they consist of the same word TITAN and they differ because applicant has added the word VANTAGE to registrant's mark.

The examining attorney has argued (Brief at 2) that when "marks are virtually the same, the addition of a house mark is more likely to add to the likelihood of confusion than to distinguish the marks." In response, applicant argues (Reply Brief at 3) that it "is true that Applicant uses its VANTAGE mark to identify three other products (i.e., VANTAGE, VANTAGE ATLAS, and EXCELART VANTAGE), but all of these products are MRI apparatus, fitting squarely within the definition of product marks, rather than a house mark." Whether a mark is or is not a house mark is not

conclusive in determining whether there is a likelihood of confusion. *Compare In re Fiesta Palms LLC*, 85 USPQ2d 1360 (TTAB 2007) (CLUB PALMS MVP confusingly similar to MVP; MVP not shown to be highly suggestive term) *with Knight Textile Corp. v. Jones Investment Co.*, 75 USPQ2d 1313 (TTAB 2005) (No likelihood of confusion between NORTON McNAUGHTON ESSENTIALS and ESSENTIALS where the evidence demonstrated that "Essentials" was a highly suggestive term).

In this case, whether applicant's VANTAGE mark is used on a wide variety of goods or on other similar goods is not outcome determinative. The addition of a distinctive term, which is not a house mark, does not necessarily result in marks that are dissimilar. *Squirtco v. Tomy Corp.*, 697 F.2d 1038, 216 USPQ 937, 939 (Fed. Cir. 1983) ("The marks SQUIRT and SQUIRT SQUAD are, however, of such similarity that they are more likely to create confusion than prevent it"). *See also In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944 (Fed. Cir. 2004) (JOSE GASPAR GOLD for tequila confusingly similar to GASPAR ALE for ale).

Here, applicant has taken the entire registered mark and added a term that it describes as its product mark. Even if VANTAGE is a product mark, there is no rule that adding a product mark to a registered mark avoids confusion while adding a house mark results in confusion. Such a

7

rule would be illogical.[7] *In re United States Shoe Corp.*, 229 USPQ 707 (TTAB 1985) (Applicant's CAREER IMAGE similar to registrant's CREST CAREER IMAGES) and *In re Apparel Ventures, Inc.*, 229 USPQ 225, 226 (TTAB 1986) ("The words 'by sassafras' indicate to prospective purchasers that 'sassafras' is the name of the entity which is the source of the 'SPARKS' brand clothing"). Inasmuch as the words "Vantage" and "Titan" are not naturally associated, the term TITAN will retain its identity as a separately identifiable term in the mark. *Squirtco*, 216 USPQ at 939 ("[I]n SQUIRT SQUAD, SQUIRT retains its identity").

Applicant also argues that the "evidence of numerous third-party registrations for TITAN-formative marks for medical apparatus establishes that the cited mark is highly suggestive and accorded a very narrow scope of protection." Brief at 3. The Federal Circuit has made it clear that:

> The probative value of third-party trademarks depends entirely upon their usage. *E.g., Scarves by Vera, Inc. v. Todo Imports, Ltd*., 544 F.2d 1167, 1173 (2d Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage. Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers.")… As this court has previously recognized where the "record includes no evidence about the *extent of [third-party] uses* … [t]he probative value of this

---

[7] Applicant's reference to TMEP § 1402.03(b) (5th ed. September 2007) is not on point. That section deals with permitting an applicant to identify its goods in the application as "a house mark for …" rather than including a long list of goods.

evidence is thus minimal." *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1338 (Fed. Cir. 2001) (emphasis added).

*Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1689, 73 USPQ2d 1689, 1693 (Fed. Cir. 2005).

Here, applicant has presented no evidence of use so we must accord this evidence minimal weight. Even if we considered the registrations, we note that they often involve different goods such as protective mouth guards (No. 0829175), dental handpieces (No. 1031351), device for the controlled delivery of light and energy for dermatological applications (Nos. 3084944 and 3085072, same registrant), penile prostheses (No. 2872319), and operating tables (No. 3414719) or marks with other meanings such as TITANIT (No. 2639655) and TITANO (No. 2774416).[8]

We add that it is proper to consider these types of registrations as a form of a dictionary definition. *In re*

---

[8] The last two registrations as well as No. 3233686 (MRP-TITAN) and application Nos. 78594851 (TITAN B) and 79026283 (TITAN) are not based on use. "Such registrations and applications are not even necessarily evidence of a serious intent to use the marks shown therein in the United States on all of the listed goods and services, and they have very little, if any, persuasive value on the point for which they were offered." *Mucky Duck*, 6 USPQ2d at 1470 n.6. Further, the third-party applications submitted by applicant have "no probative value other than as evidence that the application was filed." *In re Phillips-Van Heusen Corp.*, 63 USPQ2d 1047, 1049 n.4 (TTAB 2002).

*Box Solutions Corp.*, 79 USPQ2d 1953, 1955 (TTAB 2006) ("[T]hird-party registrations can be used in the manner of a dictionary definition to illustrate how a term is perceived in the trade or industry"). *See also In re J.M. Originals Inc.*, 6 USPQ2d 1393, 1394 (TTAB 1987) ("[T]hird party registrations are of use only if they tend to demonstrate that a mark or a portion thereof is suggestive or descriptive of certain goods and hence is entitled to a narrow scope of protection").

Regarding the nature of the term "Titan," applicant points out that "the Board has expressly held that 'TITAN' is undoubtedly a laudatory term denoting enormous strength or size which suggests why registrant, applicant, and the many third-party registrants and others have adopted and used or registered this term as trademarks for their different goods and/or incorporated the term as a part of their company names." Reply Brief at 5, *quoting In re Bayuk Cigars Inc.*, 197 USPQ 627, 628 (TTAB 1977).[9] Applicant maintains that "'enormous strength or size' [is] *the very same meaning* it has in relation to both

---

[9] *See also Cabot Corp. v. Titan Tool, Inc.*, 209 USPQ 338, 343-44 (TTAB 1980) ("In view of the definition of the term 'TITAN' and respondent's third-party evidence, the following statement in *In re Bayuk Cigars Incorporated*, 197 USPQ 627 (TTAB, 1977), relative to the nature of the term, its ability to function as a trademark, and the scope of protection to be afforded it, as applied to particular goods, is equally applicable herein").

Applicant's and Registrant's marks." Brief at 5. In the context of cigars, the term TITAN would be highly laudatory in suggesting that the cigars were of great size. However, in the context of diagnostic imaging machines, it is less likely that prospective purchasers will look at an ultrasound machine, such as registrant's shown below (or an MRI medical imaging machine[10]) and conclude that TITAN is a laudatory term.



TITAN® is a high-resolution modular ultrasound system. It provides health care professionals with state of the art high-resolution ultrasound imaging wherever needed for responsive, rapid patient care.

The SonoSite

Therefore, considering the third-party registrations for other less closely related medical products and the prior case law, we find that the term TITAN for medical diagnostic apparatus, to the extent that it is laudatory, is only slightly laudatory, and it is not entitled to only a narrow scope of protection.[11]

---

[10] Applicant's MRI apparatus "boasts a 71-centimeter [28 inch] opening." *Business Wire*, October 8, 2008.

[11] We note that "titan" has numerous other meanings including a character from classical mythology; a moon of Saturn; a person of enormous size, strength, power, or influence; and an intercontinental ballistic missile. *See* Response dated April 3, 2008, attachment.

In this case, the marks TITAN and VANTAGE TITAN are more similar than they are different. Applicant has taken registrant's mark and added its "product mark" to it. It is not clear why the addition of the word VANTAGE would avoid confusion. It is more likely to be considered another product from the previously anonymous source of TITAN medical diagnostic apparatus, namely, medical ultrasound devices.

Therefore, we find that the marks are similar and this factor supports a conclusion that there is a likelihood of confusion.

Another important factor is the question of whether the goods are related. We must consider the goods as they are identified in the application and registration. *Octocom Systems, Inc. v. Houston Computers Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). Applicant maintains that while "both marks identify some type of medical diagnostic product in the broad sense, this fact alone is not enough to support a likelihood of confusion." Brief at 13. However, "goods that are neither used together nor related to one another in kind may still 'be related in the mind of the consuming public as to the origin of the goods. It is this sense of relatedness that matters in the likelihood of confusion analysis.'" *Shen*

*Mfg. Co. v. Ritz Hotel Ltd.*, 393 F.3d 1238, 73 USPQ2d 1350 (Fed. Cir. 2004) (*citing Recot*, 54 USPQ2d at 1898). *See also McDonald's Corp. v. McKinley*, 13 USPQ2d 1895, 1898 (TTAB 1989) ("In order to find that there is a likelihood of confusion, it is not necessary that the goods or services on or in connection with which the marks are used be identical or even competitive. It is enough if there is a relationship between them such that persons encountering them under their respective marks are likely to assume that they originate at the same source or that there is some association between their sources").

Here, several facts support the conclusion that applicant's medical magnetic resonance imaging diagnostic apparatus, namely, MRI diagnostic apparatus, and registrant's medical diagnostic apparatus, namely, medical ultrasound device, are related. First, both goods are medical diagnostic apparatus with imaging functions. Second, the facts show that MRI and ultrasound diagnostic equipment originate from the same source.[12] Third, the same facilities (hospitals and diagnostic centers) have both MRI

---

[12] While applicant points out that some of these companies are "large international companies often engaged in vast and diverse business areas" (Brief at 15), this fact would not mean that this evidence is irrelevant. When applicant and its competitors are the source of both applicant's and registrant's goods in the same field, it is of no aid to applicant to show that its competitors also make unrelated products.

and ultrasound equipment.  Fourth, MRI and ultrasound equipment can serve complementary purposes, for they can be used by physicians and other medical personnel in the treatment of the same patient for such diseases as prostate and breast cancer or in the treatment of a patient with a fibroid tumor.  When we consider that applicant's and registrant's goods are medical diagnostic equipment that can originate from the same source (applicant itself is a source of both types of equipment), that can be purchased by the same facilities, and that are used on the same patients to treat the same disease by the same physician, we conclude that these goods are related.[13]

Applicant points to six pairs of registrations and argues that the USPTO "has allowed similar marks for MRI and ultrasound equipment."  Brief at 14 (PANACEA DISCOVERY/QOUSTIC PANACEA[14]; AUTOALIGN/AUTOSOUND; MICROMAXX/NEOMAXX; OPTISON/OPTI-GO; QUALITY FOR LIFE/MADE

---

[13] We are not basing our conclusion that the goods are related on the simple fact that hospitals can purchase both applicant's and registrant's goods.  "The 'hospital community' is not a homogeneous whole, but is composed of separate departments with diverse purchasing requirements…."  *Astra Pharmaceutical Products v. Beckman Instruments, Inc.*, 718 F.2d 1201, 220 USPQ 786, 791 (1st Cir. 1983).  However, the record in this application contains reports that Teton Radiology and Health Scan Imaging use both types of equipment for their specific diagnostic facilities and it suggests that the same would be true of a hospital's comparable diagnostic facility.
[14] This mark is still a pending application.

FOR LIFE; and STARLINK/PRINTLINK).  We note that "the third party registrations relied on by applicant cannot justify the registration of another confusingly similar mark."  *Plus Products v. Star-Kist Foods, Inc.*, 220 USPQ 541, 544 (TTAB 1983).  *See also Curtice-Burns, Inc. v. Northwest Sanitation Products, Inc.*, 530 F.2d 1396, 189 USPQ 138 (CCPA 1976):

> [A]ppellant relies on *Hunt [Foods and Industries, Inc. v. The Gerson Stewart Corp*., 367 F.2d 431, 151 USPQ 350 (1966)] to show that the facts here as to the parties' marks and products parallel those in *Hunt*, which is not the case, on which precedential basis we are asked to find likelihood of confusion, as we did in *Hunt*.  We said in *Industrial Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 177 USPQ 386 (CCPA 1973), as we shall evidently have to continue saying ad nauseam:
>
>> As we have said innumerable times, prior decisions on other marks for other goods are of very little help one way or the other in cases of this type.  Each case must be decided on its own facts and the differences are often subtle ones.

*Accord In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to Nett Designs' application, the PTO's allowance of such prior registrations does not bind the Board or this court").

We note that none of applicant's pairs of registrations involves an example where an applicant has taken an entire registered mark and added an additional word to it.  In addition, the marks involved are so

15

different from the present case that, even if they were relevant, they would merely stand for the principle that the Office determines each case on its own merits.

Regarding the factors concerning purchasers and channels of trade, the examining attorney has included internet websites showing that MRI and ultrasound equipment are sold in the same trade channels. *See, e.g.,* www.amberusa.com (MRI and ultrasound equipment); www.medical.philips.com (Imaging – Magnetic Resonance and Ultrasound); www.absolutemed.com (Ultrasound and MRI Machines). Also, inasmuch as physicians and other medical professionals use both types of medical imaging equipment, the same medical personnel are likely to be involved in, or actually make, purchasing decisions for both products as opposed to the purchasing agent who may merely complete the purchase order. *See Electronic Design & Sales Inc. v. Electronic Data Systems Corp.*, 954 F.2d 713, 21 USPQ2d 1388, 1391 (Fed. Cir. 1992) ("[E]ven when there is an overlap in purchasing persons due to a common purchasing agent, such an agent is not necessarily a 'relevant person' for determining likelihood of confusion"). Therefore, we conclude that the purchasers and channels of trade are likely to overlap.

In response, applicant submits (Reply Brief at 7, numbering corrected) that:

> its evidence showing that MRI and ultrasound: (1) utilize distinctly different technologies; (2) are received by patients in very different ways (wand placed against the body v. lying within a large scanning machine); (3) are both highly complex and expensive; (4) are purchased by very knowledgeable and sophisticated doctors and hospital administrators; (5) are taken with great care and consideration, should have the same persuasive effect as in *In re Digirad* [*Corp*., 45 USPQ2d 1841 (TTAB 1998)].

Applicant also refers to the cases of *Astra Pharmaceutical* and *Electronic Design*. However, as explained by the *Electronic Design* Court (21 USPQ2d at 1390-91), "Astra sold pharmaceutical products to hospital pharmacies and Beckman sold laboratory instrumentation to hospital laboratories." In reaching a conclusion similar to that in *Astra Pharmaceutical*, the Court held that: "Although opposer's services and applicant's goods are purchased by some of the same large corporations, the individual departments therein may be as independent in their purchasing activities as were the hospital departments in *Astra*. In such corporations, it cannot be presumed, as the Board apparently did, that the general computer services are selected by the same individuals who

17

select battery chargers and power supplies." *Id.* at 1391.[15]

Here, the facts are different, with both items likely to be purchased by the same departments or diagnostic facilities with the involvement of the same physicians in the purchasing decision.

We have also considered the *Digirad* case but it does not compel a conclusion that confusion is unlikely. In that case, applicant sought to register the mark DIGIRAD for solid state gamma radiation sensors, signal processors, and display apparatus for use in medical isotopic tracing and medical nuclear imaging. The examining attorney refused to register the mark because of a registration for the mark DIGIRAY for an electronic digital x-ray system. In that case, the board found that purchasers "will easily distinguish between the marks DIGIRAY and DIGIRAD based upon the connotations of RAY and RAD in connection with the parties' respective goods" (*Id.* at 1845); that the examining attorney's registration evidence did not show "a

---

[15] Applicant also relies on the case of *In re N.A.D. Inc.*, 754 F.2d 996, 224 USPQ 969 (Fed. Cir. 1985). However, a key factor in that case was the presence of a consent agreement from the registrant, a fact not present in the instant case. *Id.* at 971 ("This consent, moreover, having been given by a competitor well acquainted with the realities of the business suffices to persuade us, when taken together with all of the other facts, that the board and the Examining Attorney were simply wrong in their opinions that there would be a likelihood of confusion, and we so hold").

single one includ[ing] both parties' goods identified herein" (*Id.* at 1844); and that there are "differences in the relevant purchasers" (*Id.*). The record in the present case is simply different. The TITAN part of the marks is identical and it would not signal to potential purchasers that the goods emanate from or are associated with different sources; the involved goods do, in the marketplace, originate from some of the same sources; and the purchasers (or those involved in making purchasing decisions) would overlap. *Digirad* does not establish a per se rule that non-identical, expensive medical products are unrelated. In the present case, the record supports a conclusion that the goods are related.

Lastly, we address applicant's argument about the sophistication of the purchasers, which is coupled with the expensive nature of the products. It seems beyond dispute that ultrasound and MRI imaging equipment is expensive and that the purchasers of these products would be sophisticated. Sophistication of the purchasers is also an important factor in avoiding confusion. *Electronic Design*, 21 USPQ2d at 1392 (internal quotation marks omitted) ("Where the purchasers are the same, their sophistication is important and often dispositive because sophisticated consumers may be expected to exercise greater care").

However, even sophisticated purchasers may be confused. *Imagineering Inc. v. Van Klassens Inc.*, 53 F.3d 1260, 34 USPQ2d 1526, 1530 (Fed. Cir. 1995) (The "record shows that the buyers of Imagineering's and Van Klassens' furniture are sophisticated. While a sophisticated purchaser might more easily discern distinctions between Van Klassens' and Imagineering's furniture, the record in this case shows that even a trained furniture salesman could not distinguish the two products"); *Weiss Associates Inc. v. HRL Associates Inc.*, 902 F.2d 1840, 14 USPQ2d 1840, 1841-42 (Fed. Cir. 1990) ("On the issue of sophisticated purchaser, this court also agrees with the Board… The Board took into account the theory, but said that the similarities in the products overshadow the sophistication of the purchasers"); and *In re Total Quality Group Inc.*, 51 USPQ2d 1474, 1477 (TTAB 1999) ("[E]ven careful purchasers are not immune from source confusion").

Here, we cannot conclude that the sophisticated purchasers of ultrasound and MRI medical diagnostic equipment would not be confused when the marks TITAN and VANTAGE TITAN are used on these goods. These purchasers are likely to be aware that a single entity can be the source of both such products. *Palm Bay*, 73 USPQ2d at 1695 ("And even more sophisticated purchasers might be aware

that champagne houses offer both types of products under similar marks, and could easily conclude that VEUVE ROYALE was Veuve Clicquot's sparkling wine").  These purchasers, familiar with registrant's products, are likely to participate in purchasing decisions involving applicant's goods, and assume that the products are associated or related in some way.  The fact that purchasers may study the specimens and determine that applicant's and registrant's imaging devices originate from different sources is not relevant.  We must consider whether the marks TITAN and VANTAGE TITAN when used on the identified goods are confusingly similar.  *Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 202 USPQ 100, 104 n.6 (CCPA 1979) ("Likelihood of confusion occurs upon observance of the mark and goods.  It need not await a reading of the book.  The mark, not the specimen, is submitted for registration").  In this case, after we consider all the evidence of record, we conclude that there is a likelihood of confusion.

To the extent that we have any doubt about this conclusion, we must resolve this doubt in favor of the registrant.  *In re Chatam International Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1948 (Fed. Cir. 2004) and *In re Hyper*

21

*Shoppes (Ohio), Inc.*, 837 F.2d 463, 6 USPQ2d 1025, 1026 (Fed. Cir. 1988).

Decision:  The examining attorney's refusal to register applicant's mark VANTAGE TITAN under Section 2(d) of the Trademark Act is affirmed.